GARY M. RESTAINO
United States Attorney
District of Arizona

MATTHEW WILLIAMS
Assistant U.S. Attorney
Arizona State Bar No. 029059
Two Renaissance Square
40 N. Central Ave., Suite 1800
Phoenix, Arizona 85004
Telephone: 602-514-7500
Email: matthew.williams3@usdoj.gov

GLENN S. LEON
Chief
Criminal Division, Fraud Section
U.S. Department of Justice

SHANE BUTLAND
Trial Attorney
Criminal Division, Fraud Section
U.S. Department of Justice
1400 New York Avenue NW
Washington, D.C. 20005
Telephone: 202-286-1177
Email: shane.butland2@usdoj.gov
Attorneys for Plaintiff

CR-24-1040-PHX-ROS (DMF)

REDACTED FOR
PUBLIC DISCLOSURE

FILED ___ LODGED
___ RECEIVED ___ COPY

JUN 1 8 2024

CLERK U S DISTRICT COURT
DISTRICT OF ARIZONA
BY_____ DEPUTY

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | No. |
| Plaintiff, | **I N D I C T M E N T** |
| vs. | VIO: 18 U.S.C. § 1349 (Conspiracy) Count 1 |
| 1. Alexandra Gehrke, a/k/a "Lexie" Gehrke, and **(Counts 1-4, 6, 8-10)** | 18 U.S.C. § 1347 and 18 U.S.C. § 2 (Health Care Fraud) Counts 2-3 |
| 2. Jeffrey King, **(Counts 1-5, 7, 10)** | 18 U.S.C. § 371 (Conspiracy) Count 4 |
| Defendants. | 42 U.S.C. § 1320a-7b(b)(1) and 18 U.S.C. § 2 (Receipt of Kickbacks) Counts 5-6 |
| | 18 U.S.C. § 1957 and 18 U.S.C. § 2 (Transactional Money Laundering) Counts 7-10 |
| | 18 U.S.C. § 981(a)(1)(C) 18 U.S.C. §§ 982(a)(1), (b) 18 U.S.C. § 853 28 U.S.C. § 2461(c) (Forfeiture Allegations) |

**THE GRAND JURY CHARGES**:

At all times material to this Indictment, within the District of Arizona and elsewhere:

## INTRODUCTION

1.      Defendants ALEXANDRA GEHRKE and JEFFREY KING, together with their co-conspirators, targeted elderly Medicare patients, many of whom were terminally ill in hospice care, and caused medically unnecessary amniotic wound allografts to be applied to these vulnerable patients. From in or around November 2022, through in or

around May 2024, the Defendants and their co-conspirators, individually and through companies they owned and controlled, caused more than approximately $900 million in false and fraudulent claims to Medicare for these medically unnecessary allografts applied to less than approximately 500 patients. Medicare and other health care benefit programs paid over $600 million based on these false and fraudulent claims. The Defendants received more than $330 million in illegal kickbacks as a result of their fraud scheme, which they used to further the fraud and diverted for their personal benefit and the benefit of others.

## The Defendants and Related Entities

2.      Defendant ALEXANDRA GEHRKE was a resident of Phoenix, Arizona. ALEXANDRA GEHRKE co-owned, controlled, and operated Apex Mobile Medical LLC ("Apex Mobile Medical"). ALEXANDRA GEHRKE co-owned, controlled, and operated Apex Medical LLC ("Apex") and served as its Chief Executive Officer. ALEXANDRA GEHRKE solely owned, controlled, and operated Viking Medical Consultants LLC ("Viking").

3.      Defendant JEFFREY KING was a resident of Phoenix, Arizona. JEFFREY KING was a sales representative for Apex. JEFFREY KING was also a co-owner and managing partner of APX Mobile Medical LLC ("APX"). JEFFREY KING married ALEXANDRA GEHRKE in or around February 2024.

4.      "Company 1" was a limited liability company formed under the laws of Texas, with its principal place of business in Fort Worth, Texas. Company 1 was a wholesale distributor of allografts. Medicare reimbursed claims for allografts distributed by Company 1 at an extremely high rate, exceeding $1,000 per square centimeter for certain allografts.

5.      Apex Mobile Medical was a limited liability company formed under the laws of Arizona, with its principal place of business in Phoenix, Arizona. Apex Mobile Medical was an enrolled Medicare provider and submitted claims to Medicare for payment, including claims for the furnishing of allografts purchased from Company 1.

- 3 -

6.     APX was a limited liability company formed under the laws of Arizona, with its principal place of business in Phoenix, Arizona. APX was an enrolled Medicare provider and submitted claims to Medicare for payment, including claims for the furnishing of allografts purchased from Company 1.

7.     Apex was a limited liability company formed under the laws of Arizona, with its principal place of business in Phoenix, Arizona. Apex arranged for and recommended the ordering and purchasing of allografts sold by Company 1. Apex also referred patients to enrolled Medicare providers, including Apex Mobile Medical and APX, for the furnishing of allografts purchased from Company 1.

8.     Viking was a limited liability company formed under the laws of Arizona, with its principal place of business in Phoenix, Arizona. Viking arranged for and recommended the ordering and purchasing of allografts sold by Company 1. Viking also referred patients to enrolled Medicare providers, including APX, for the furnishing of allografts purchased from Company 1.

**The Medicare Program**

9.     The Medicare program ("Medicare") was a federal health care program providing benefits to persons who were 65 years of age or over or disabled. Medicare was administered by the Centers for Medicare and Medicaid Services ("CMS"), a federal agency under the United States Department of Health and Human Services ("HHS"). Individuals who received benefits under Medicare were referred to as Medicare "beneficiaries."

10.     Medicare was a "health care benefit program," as defined by 18 U.S.C. § 24(b), and a "Federal health care program," as defined by 42 U.S.C. § 1320a-7b(f), and affected interstate commerce.

11.     Medicare covered different types of benefits and was separated into different program "parts." Medicare "Part A" covered, among others, health services provided by skilled nursing facilities, hospices, and home health agencies. Medicare "Part B" covered,

- 4 -

among other things, medical items and services provided by physicians, nurse practitioners, group practices, and other qualified health care providers, that were medically necessary and ordered by licensed medical doctors or qualified health care providers.

12. Physicians, nurse practitioners, group practices, and other health care providers (collectively, "providers") that provided items and services to beneficiaries were able to apply for and obtain a "provider number." A provider that received a Medicare provider number was able to file claims with Medicare to obtain reimbursement for items and services provided to beneficiaries.

13. A Medicare claim was required to contain certain important information, including: (a) the beneficiary's name; (b) a description of the health care benefit, item, or service that was provided or supplied to the beneficiary; (c) the billing codes for the benefit, item, or service; (d) the date upon which the benefit, item, or service was provided or supplied to the beneficiary; and (e) the name of the ordering, referring, or rendering physician or other health care provider. The claim form could be submitted in hard copy or electronically via interstate wire.

14. As a requirement to enroll as a Medicare provider, Medicare required providers to agree to abide by Medicare laws, regulations, and program instructions. Medicare further required providers to certify that they understood that payment of a claim by Medicare was conditioned upon the claim and the underlying transaction complying with these laws, regulations, and program instructions, including the Federal Anti-Kickbacks Statute. Medicare paid for claims only if the items and services were medically reasonable, medically necessary for the treatment or diagnosis of the patient's illness or injury, accurately documented, and provided as represented to Medicare. Medicare would not pay for items and services that were procured through illegal kickbacks.

15. Medicare covered access to certain bioengineered skin substitutes, including some amniotic membrane allografts made from human placental tissue ("allografts"). These allografts were applied over open wounds to assist with wound closure or skin

growth. Medicare reimbursed providers for certain allografts furnished to Medicare beneficiaries only if the allografts were medically reasonable, medically necessary for the treatment or diagnosis of the beneficiary's illness or injury, accurately documented, provided as represented to Medicare, and not procured through illegal kickbacks.

## CHAMPVA

16.    The Civilian Health and Medical Program of the Department of Veterans Affairs ("CHAMPVA") was a federal health care benefit program within the United States Department of Veterans Affairs ("VA"). CHAMPVA was a comprehensive health care program in which the VA shared the cost of covered health care services and supplies with eligible beneficiaries. The eligible categories for CHAMPVA beneficiaries were the spouses or children of veterans of the United States military who had been rated permanently and totally disabled for a service-connected disability and the surviving spouse or child of a veteran who died from a VA-related service-connected disability.

17.    In general, CHAMPVA covered most health care services and supplies that were medically and psychologically necessary. CHAMPVA was always the secondary payer to another health benefit program, including Medicare, and reimbursed costs that the primary health care benefit program did not cover. For Medicare beneficiaries with CHAMPVA coverage, health care claims were first sent to Medicare for processing, and then Medicare electronically forwarded claims to CHAMPVA.

18.    CHAMPVA was a "health care benefit program," as defined by 18 U.S.C. § 24(b), and a "Federal health care program," as defined by 42 U.S.C. § 1320a-7b(f), and affected interstate commerce.

## TRICARE

19.    TRICARE was a federal health insurance program of the United States Department of Defense ("DOD") Military Health System that provided coverage for DOD beneficiaries worldwide, including active-duty service members, National Guard and Reserve members, retirees, their families, and their survivors. The Defense Health Agency,

- 6 -

an agency of the DOD, was the governmental entity responsible for overseeing and administering TRICARE.

20.     TRICARE offered health insurance benefits for items and services that were medically necessary. TRICARE reimbursed providers based on payment rates from applicable fee and rates schedules. Generally, when a beneficiary was eligible for Medicare and TRICARE, TRICARE was secondary to Medicare.

21.     TRICARE was a "health care benefit program," as defined by 18 U.S.C. § 24(b), and a "Federal health care program," as defined by 42 U.S.C. § 1320a-7b(f), and affected interstate commerce.

### Commercial Insurance Plans

22.     Commercial insurance plans were provided by private health insurance companies ("Commercial Insurers") that offered individual and group health benefit plans under which individuals could obtain coverage for health care items and services. Individuals who received benefits from Commercial Insurers were referred to as "members."

23.     Commercial Insurers often made payments directly to providers, rather than to members who received the health care benefits, items, and services.

24.     To obtain payment for treatment or services provided to a member, providers were required to submit itemized claim forms to the member's commercial insurance plan. The claim forms were typically submitted electronically. The claim form required certain important information, including: (a) the member's name and identification number; (b) a description of the health care benefit, item, or service that was provided or supplied to the member; (c) the billing codes for the benefit, item, or service; (d) the date upon which the benefit, item, or service was provided or supplied to the member; and (e) the name of the referring physician or other provider, as well as the applicable identification number for the referring physician or provider.

25.     When a provider submitted a claim to Commercial Insurers, the provider

1  certified that the contents of the form were true, correct, and complete, and that the form
2  was prepared in compliance with applicable laws and regulations. The provider also
3  certified that the items or services being billed were medically necessary and provided as
4  represented.

5      26.    Each of the Commercial Insurers was a "health care benefit program," as
6  defined in 18 U.S.C. § 24(b), and affected interstate commerce.

8                          **COUNT 1**
9                          **Conspiracy**
10                     **(18 U.S.C. § 1349)**

11      The factual allegations in the preceding paragraphs are incorporated by reference
12  and re-alleged as though fully set forth herein.

13      27.    Beginning in or around June 2022, and continuing through in or around May
14  2024, in the District of Arizona and elsewhere, Defendants ALEXANDRA GEHRKE and
15  JEFFREY KING, individually and doing business under the entities described above, along
16  with other individuals and entities known and unknown to the grand jury, knowingly and
17  willfully agreed and conspired with each other and others to commit the following offenses
18  against the United States: wire fraud, in violation of 18 U.S.C. § 1343; and health care
19  fraud, in violation of 18 U.S.C. § 1347.

20                  **Purpose of the Conspiracy**
21      28.    The purpose of the conspiracy was for Defendants ALEXANDRA
22  GEHRKE, JEFFREY KING, and their co-conspirators to unlawfully enrich themselves by,
23  among other things: (a) submitting and causing the submission of false and fraudulent
24  claims to Medicare, TRICARE, CHAMPVA, and the Commercial Insurers for items and
25  services that were (i) medically unreasonable and unnecessary, (ii) ineligible for
26  reimbursement, and (iii) procured through illegal kickbacks; (b) concealing the submission
27  of false and fraudulent claims to Medicare, TRICARE, CHAMPVA, and the Commercial

28
                              - 8 -

1  Insurers and the receipt and transfer of the proceeds from the fraud; and (c) diverting
2  proceeds of the fraud for the personal use and benefit of ALEXANDRA GEHRKE,
3  JEFFREY KING, and their co-conspirators, and to further the fraud.

**Manner and Means of the Conspiracy and Scheme**

4
5  29.    The manner and means used by Defendants ALEXANDRA GEHRKE,
6  JEFFREY KING, and others, individually and through the entities described above, to
7  effect the objects of the conspiracy and scheme to defraud, included the following:

8          a.     In or around September 2022 and in or around November 2022,
9  ALEXANDRA GEHRKE falsely certified to Medicare as Apex Mobile Medical's
10 Authorized Official that she would comply with all of Medicare's laws, regulations,
11 and program instructions and that she would not knowingly present or cause to be
12 presented a false or fraudulent claim for payment to Medicare.

13         b.     In or around September 2022 and in or around November 2022,
14 ALEXANDRA GEHRKE certified to Medicare as Apex Mobile Medical's
15 Authorized Official that she understood that payment of a claim by Medicare was
16 conditioned upon the claim and the underlying transaction complying with the
17 Federal Anti-Kickback Statute.

18         c.     ALEXANDRA GEHRKE and JEFFREY KING, through Apex and
19 Viking, personally arranged for and recommended the ordering and purchasing of
20 allografts sold by Company 1, and referred patients to enrolled Medicare providers,
21 including Apex Mobile Medical and APX, for the furnishing of allografts purchased
22 from Company 1.

23         d.     ALEXANDRA GEHRKE, through Apex and Viking, contracted with
24 medically untrained sales representatives to arrange for and recommend the
25 ordering and purchasing of allografts sold by Company 1, and to refer patients to
26 enrolled Medicare providers, including Apex Mobile Medical and APX, for the
27 furnishing of allografts purchased from Company 1.

28

e. ALEXANDRA GEHRKE and JEFFREY KING, through Apex Mobile Medical and APX, contracted with nurse practitioners to order and apply Company 1's allografts to the patients referred by ALEXANDRA GEHRKE, JEFFREY KING, and the medically untrained sales representatives.

f. ALEXANDRA GEHRKE paid the sales representatives illegal kickbacks based on the quantity and size of Company 1's allografts that the nurse practitioners applied to the patients and that Apex Mobile Medical and APX billed to Medicare. These kickbacks were as high as hundreds of thousands of dollars per month for certain sales representatives.

g. ALEXANDRA GEHRKE and JEFFREY KING paid the nurse practitioners a flat rate of $500 or $1,000 per patient encounter to apply the allografts.

h. To identify Medicare patients to refer to Apex Mobile Medical for the furnishing of Company 1's allografts, JEFFREY KING instructed the sales representatives go to facilities with elderly populations, such as nursing homes, assisted living facilities, and hospice facilities, and identify patients with a "wound or wounds of any stage" that would "benefit from healing faster." JEFFREY KING and others instructed the sales representatives to take photographs of the patient's wound, measure the size of the wound, and obtain copies of the patient's insurance card.

i. ALEXANDRA GEHRKE directed the sales representatives to target hospice facilities, stating in a meeting with sales representatives that hospice facilities were "where the most money [was] at with [her] company."

j. ALEXANDRA GEHRKE directed the sales representatives to order Company 1's allografts only in sizes 4x6cm or larger—despite the availability of smaller sizes of allografts—even if the patient's wound was "the size of [her] little fingernail."

- 10 -

k.     JEFFREY KING pressured the nurse practitioners to apply Company 1's allografts to Medicare patients without regard to medical necessity, without a prior relationship with the patient, without reviewing the patients' medical records, without speaking to the patients' primary care physicians, and without exercising independent medical judgment.

l.     The nurse practitioners applied allografts to Medicare patients that were medically unreasonable and unnecessary because, among other reasons, the wounds were infected, the wounds had already healed, the wounds were not responding to the allografts, the wounds would not heal because of the terminally ill patients' comorbidities, and the allografts exceeded the size of the wound.

m.     The nurse practitioners applied allografts to terminally ill patients receiving palliative care in hospice facilities. Some patients died within days or the same day of the allograft application.

n.     From in or around June 2022, through in and around May 2024, ALEXANDRA GEHRKE received, individually and through Apex and Viking, over $240 million in illegal kickbacks from Company 1, in exchange for the purchasing, ordering, and arranging for and recommending the purchasing and ordering of Company 1's allografts that were billed to Medicare.

o.     From in or around November 2022, through in or around April 2023, ALEXANDRA GEHRKE received, through Apex Mobile Medical, illegal kickbacks in the form of rebates from Company 1 in exchange for the purchasing and ordering of Company 1's allografts that were billed to Medicare.

p.     From in or around April 2023, through in or around May 2024, JEFFREY KING received, through APX, over $90 million in illegal kickbacks in the form of rebates from Company 1 in exchange for the purchasing and ordering of Company 1's allografts that were billed to Medicare.

q.     ALEXANDRA GEHRKE, JEFFREY KING, and others concealed

- 11 -

and disguised these illegal kickbacks by, among other ways, causing sham invoices to be issued that reflected the full price, not the rebated price, of the allografts, and opening a so-called "joint venture" bank account to conceal the transfer of the illegal kickbacks from Company 1 to APX.

r.     From in or around November 2022, through in or around May 2024, defendants ALEXANDRA GEHRKE, JEFFREY KING, and others, through Apex Mobile Medical and APX, submitted over $900 million in false and fraudulent claims to Medicare, CHAMPVA, TRICARE, and the Commercial Insurers for Company 1's allografts that were medically unreasonable and unnecessary, ineligible for reimbursement, and procured through illegal kickbacks. Medicare, CHAMPVA, TRICARE, and the Commercial Insurers paid Apex Mobile Medical and APX over $600 million based on those claims.

s.     ALEXANDRA GEHRKE and JEFFREY KING used the illegal kickbacks received from Company 1 and the illegal proceeds of their fraud scheme to fund their lavish and opulent lifestyle, which included ALEXANDRA GEHRKE's purchases of a $300,000 Ferrari and a $230,000 Mercedes-Benz, JEFFREY KING's purchase of a $640,000 house, and their joint purchases of a $5.8 million house and over $520,000 in gold bars, gold coins, and jewelry.

All in violation of 18 U.S.C. § 1349.

## COUNTS 2–3
### Health Care Fraud
### (18 U.S.C. § 1347 and 18 U.S.C. § 2)

The factual allegations in paragraphs 1 through 26 are incorporated by reference and re-alleged as though fully set forth herein.

30.     Beginning in or around June 2022, and continuing through in or around May 2024, in the District of Arizona and elsewhere, Defendants ALEXANDRA GEHRKE and JEFFREY KING, individually and doing business under the entities described above, along

- 12 -

with other individuals and entities known and unknown to the grand jury, in connection with the delivery of, and payment for, health care benefits, items, and services, did knowingly and willfully execute, and attempt to execute, a scheme and artifice to defraud Medicare, TRICARE, CHAMPVA, and the Commercial Insurers, which are health care benefit programs as defined in 18 U.S.C. § 24(b), and to obtain by means of materially false and fraudulent pretenses, representatives, and promises, money and property owned by, and under the custody and control of, the health care benefit programs.

### Purpose of the Scheme

31.     Paragraph 28 is incorporated by reference and re-alleged as though fully set forth herein as the purpose of the scheme.

### Manner and Means of the Scheme

32.     Paragraph 29 is incorporated by reference and re-alleged as though fully set forth herein as the manner and means of the scheme.

### Executions of the Scheme

33.     On or about the dates specified below, in the District of Arizona and elsewhere, Defendants ALEXANDRA GEHRKE and JEFFREY KING, aided and abetted by, and aiding and abetting, others known an unknown to the grand jury, submitted and caused to be submitted the following false and fraudulent claims to Medicare for Company 1's allografts that were medically unreasonable and unnecessary, ineligible for reimbursement, and procured through illegal kickbacks, in an attempt to execute, and in execution of, the scheme as described in paragraph 30, with each execution set forth below forming a separate count:

| Ct. | Approx. Claim Date | Medicare Patient | Billing Provider | Approx. Amount Billed to Medicare | Approx. Amount Paid by Medicare |
|---|---|---|---|---|---|
| 2 | May 17, 2023 | Medicare Patient 1 | APX | $99,900 | $78,321 |
| 3 | October 20, 2023 | Medicare Patient 2 | APX | $32,202 | $25,246 |

- 13 -

Each in violation of 18 U.S.C. § 1347 and 18 U.S.C. § 2.

## COUNT 4
### Conspiracy
### (18 U.S.C. § 371)

The factual allegations in paragraphs 1 through 26 and 33 are incorporated by reference and re-alleged as though fully set forth herein.

34. Beginning in or around June 2022, and continuing through in or around May 2024, in the District of Arizona and elsewhere, Defendants ALEXANDRA GEHRKE and JEFFREY KING, individually and doing business under the entities described above, along with other individuals and entities known and unknown to the grand jury, knowingly and willfully agreed and conspired with each other and others to: defraud the United States by impairing, impeding, obstructing, and defeating through deceitful and dishonest means the lawful government functions of HHS and CMS in their administration and oversight of Medicare; soliciting and receiving illegal kickbacks, in violation of 42 U.S.C. § 1320a-7b(b)(1); and offering and paying illegal kickbacks, in violation of 42 U.S.C. § 1320a-7b(b)(2).

### Purpose of the Conspiracy

35. Paragraph 28 is incorporated by reference and re-alleged as though fully set forth herein as the purpose of the conspiracy.

### Manner and Means of the Conspiracy

36. Paragraph 29 is incorporated by reference and re-alleged as though fully set forth herein as the manner and means of the conspiracy.

### Overt Acts

37. In furtherance of the conspiracy, and to effect the objects of the conspiracy, Defendants ALEXANDRA GEHRKE and JEFFREY KING committed or caused to be committed various overt acts in the District of Arizona and elsewhere, including but not limited to the following:

a.      On or about July 8, 2022, ALEXANDRA GEHRKE, through Apex, received an illegal kickback in the approximate amount of $9,630 via a wire transfer from Company 1's bank account ending in 3813.

b.      On or about July 10, 2023, ALEXANDRA GEHRKE directed Apex "sales representatives" to order allografts no smaller than 4x6 cm, even for a wound the size of her "little fingernail."

c.      On or about August 2, 2023, JEFFREY KING, through APX, received an illegal kickback in the approximate amount of $3,702,240 via wire transfer from a bank account ending in 3585 to APX's bank account ending in 7158.

d.      On or about September 26, 2023, JEFFREY KING, through APX, received an illegal kickback in the approximate amount of $10,796,760 via wire transfer from a bank account ending in 3585 to APX's bank account ending in 7158.

e.      On or about October 11, 2023, ALEXANDRA GEHRKE, through Apex, received an illegal kickback in the amount of approximately $20,780,693 via wire transfer from Company 1's bank account ending in 3813 to Apex's bank account ending in 9686.

f.      On or about November 1, 2023, JEFFREY KING, through APX, received an illegal kickback in the approximate amount of $15,298,480 via wire transfer from a bank account ending in 3585 to APX's bank account ending in 7158.

g.      On or about December 8, 2023, ALEXANDRA GEHRKE, through Apex, received an illegal kickback in the approximate amount of $71,148,550 via wire transfer from Company 1's bank account ending in 3813 to Apex's bank account ending in 9686.

h.      On or about January 8, 2024, ALEXANDRA GEHRKE received an illegal kickback in the approximate amount of $81,782,416 via wire transfer from Company 1's bank account ending in 3813 to Apex's bank account ending in 9686.

i.      On or about January 15, 2024, ALEXANDRA GEHRKE issued a

- 15 -

check to JEFFREY KING's company, King Medical Consultant LLC, in the approximate amount of $2,723,713 with the memo "commission income Dec collected revenue 2%," drawn on Apex's bank account ending in 9686.

All in violation of 18 U.S.C. § 371.

**COUNTS 5–6**
**Receipt of Kickbacks**
**(42 U.S.C. § 1320a-7b(b)(1) and 18 U.S.C. § 2)**

The factual allegations in paragraphs 1 through 26, 28, 29, 33, and 37 are incorporated by reference and re-alleged as though fully set forth herein.

38.     On or about the approximate dates set forth below, in the District of Arizona and elsewhere, ALEXANDRA GEHRKE and JEFFREY KING did knowingly and willfully solicit and receive remuneration, specifically, kickbacks, bribes, and rebates, directly and indirectly, overtly and covertly, in cash and in kind, in return for (a) referring an individual to a person for the furnishing and arranging for the furnishing of any item and service for which payment may be made in whole and in part under a Federal health care program, and (b) purchasing, leasing, ordering, and arranging for and recommending purchasing, leasing, and ordering any good, facility, service, and item for which payment may be made in whole and in part by a Federal health care program, as set forth below:

| Ct. | Defendant | Approx. Date | Originating Account | Receiving Account | Approx. Amount |
|---|---|---|---|---|---|
| 5 | JEFFREY KING | August 2, 2023 | Bank Account Ending in 3585 | APX's Bank Account Ending in 7158 | $3,702,240 |
| 6 | ALEXANDRA GEHRKE | October 11, 2023 | Company 1's Bank Account Ending in 3813 | Apex's Bank Account Ending in 9686 | $20,780,693 |

Each in violation of 42 U.S.C. § 1320a-7b(b)(1) and 18 U.S.C. § 2.

- 16 -

**COUNTS 7–10**
**Transactional Money Laundering**
**(18 U.S.C. § 1957 and 18 U.S.C. § 2)**

The factual allegations in paragraphs 1 through 26, 28, 29, 33, and 37 are incorporated by reference and re-alleged as though fully set forth herein.

39.    On or about the approximate dates listed below, Defendants ALEXANDRA GEHRKE and JEFFREY KING, individually and doing business under the entities described above, along with other individuals and entities known and unknown to the grand jury, in the District of Arizona and elsewhere, knowingly engaged and attempted to engage in the following transactions in the United States with criminally derived property of a value exceeding $10,000, derived from specified unlawful activity, namely wire fraud, in violation of 18 U.S.C. § 1343, health care fraud, in violation of 18 U.S.C. § 1347, conspiracy to commit wire fraud and health care fraud, in violation of 18 U.S.C. § 1349, conspiracy to defraud the United States and pay and receive illegal health care kickbacks, in violation of 18 U.S.C. § 371, and paying and receiving illegal health care kickbacks, in violation of 42 U.S.C. § 1320a-7b(b):

| Ct. | Defendant | Approx. Date | Originating Account | Description of Property Purchased | Approx. Amount |
|---|---|---|---|---|---|
| 7 | JEFFREY KING | August 21, 2023 | King Medical Consultant Bank Account Ending in 8875 | 1637 North Sunset Drive, Tempe, AZ 85288 | $638,449 |
| 8 | ALEXANDRA GEHRKE | January 4, 2024 | Jexie Enterprises Bank Account Ending in 8870 | 2016 Ferrari 488 Spider | $294,909 |
| 9 | ALEXANDRA GEHRKE | January 4, 2024 | Jexie Enterprises Bank Account Ending in 8870 | 2023 Mercedes-Benz | $227,343 |
| 10 | ALEXANDRA GEHRKE and JEFFREY KING | January 5, 2024 | Capital Is King Bank Account Ending in 5191 | 6246 East Hillcrest Blvd., Scottsdale, AZ 85215 | $5,489,793 |

Each in violation of 18 U.S.C. § 1957 and 18 U.S.C. § 2.

**FORFEITURE ALLEGATIONS**

The factual allegations in the preceding paragraphs are incorporated by reference and re-alleged as though fully set forth herein.

40.    Pursuant to 18 U.S.C. §§ 981 and 982, 21 U.S.C. § 853, and 28 U.S.C. § 2461(c), and upon conviction of one or more of the offenses alleged in Counts 1 through 10 of this Indictment, Defendants ALEXANDRA GEHRKE and JEFFREY KING, shall forfeit to the United States all right, title, and interest in any and all property, real or personal, involved in such offense(s), or any property traceable to such property involved in the offense(s), or conspiracy to commit such offense(s), including the following:  (a) all money or other property that was the subject of each transaction, transportation, transmission or transfer in violation of a statute listed in 18 U.S.C. § 982, (b) all other property constituting proceeds obtained as a result of those violations, and (c) all property used in any manner or part to commit or to facilitate the commission of those violations including, but not limited to the sum of money representing the amount of money involved in the offense(s) and the property named below.

a.    The property at 1637 North Sunset Drive, Tempe, Arizona 85281, titled to J KING HOLDINGS LLC.

b.    The property at 6246 East Hillcrest Blvd., Scottsdale, Arizona 85251, titled to AEAGJK IRREVOCABLE TRUST.

c.    The 2016 Ferrari 488 Spider bearing Vehicle Identification Number ZFF80AMA6G0219407, titled to JEXIE ENTERPRISES INC.

d.    The 2023 Mercedez-Benz SL63 AMG bearing Vehicle Identification Number W1KVK8BB6PF015497, titled to JEXIE ENTERPRISES INC.

e.    2023 Mercedes-Benz GLE bearing Vehicle Identification Number 4JGFB6BB7PA858815, titled to APX MOBILE MEDICAL LLC.

f.    The 2022 Mercedes-Benz G63 bearing Vehicle Identification Number W1NYC8AJ6NX455281, titled to JEXIE ENTERPRISES INC.

g. $524,745 of gold bars, gold coins, and jewelry purchased by ALEXANDRA GEHRKE and JEFFREY KING.

h. $19,591,940 held in the U.S. Bank checking account ending in 5798 in the name of ALEXANDRA GEHRKE.

i. $13,758,004 held in the U.S. Bank checking account 7681 in the name of AMTG MEDICAL CONSULTANT LLC.

j. $10,793,620 held in the U.S. Bank checking account ending in 7699 in the name of JEXIE ENTERPRISES INC.

k. $8,000,000 life insurance policy number ending in 5602 held by Sentinel Security Life Insurance Company in the name of ALEXANDRA GEHRKE.

l. $8,000,000 life insurance policy number ending in 8279 held by Sentinel Security Life Insurance Company in the name of JEFFREY KING.

m. $5,688,109 held in the Wells Fargo Bank checking account ending in 1101 in the name of JEXIE ENTERPRISES INC.

n. $2,800,000 held in the Alerus Bank checking account ending in 8329 in the name of JEXIE ENTERPRISES INC.

o. $1,999,978 held in the Alerus Bank checking account ending in 7834 in the name of ALEXANDRA GEHRKE.

p. $1,634,604 held in the U.S. Bank checking account ending in 0238 in the name of ALEXANDRA GEHRKE.

q. $1,470,614 held in the Alerus Bank checking account ending in 8220 in the name of AMTG MEDICAL CONSULTANT LLC.

r. $1,000,000 held in the JP Morgan Chase certificate of deposit account ending in 5107 in the name of JEXIE ENTERPRISES INC.

s. $940,373 held in the U.S. Bank checking account ending in 7665 in the name of THE FITZGERALD IRREVOCABLE TRUST.

t. $912,857 held in Alerus Bank checking account ending in 2750 in the name of CAPITAL IS KING LLC.

41. If any of the above-described forfeitable property, as a result of any act or omission of the defendant(s):

       a. cannot be located upon the exercise of due diligence,

       b. has been transferred or sold to, or deposited with, a third party,

       c. has been placed beyond the jurisdiction of the court,

       d. has been substantially diminished in value, or

       e. has been commingled with other property which cannot be divided without difficulty,

it is the intent of the United States to seek forfeiture of any other property of said defendant(s) up to the value of the above-described forfeitable property, pursuant to 21 U.S.C. § 853(p).

//
//
//
//
//
//
//
//
//
//
//
//
//

42.     All in accordance with 18 U.S.C. §§ 981 and 982, 21 U.S.C. § 853, 28 U.S.C. § 2461(c), and Federal Rule of Criminal Procedure 32.2.

A TRUE BILL

_/S/_
FOREPERSON OF THE GRAND JURY
Date: June 18, 2024

GARY M. RESTAINO
United States Attorney
District of Arizona


_/S/_
MATTHEW WILLIAMS
Assistant U.S. Attorney


GLENN S. LEON
Chief
Criminal Division, Fraud Section
U.S. Department of Justice


_/S/_
SHANE BUTLAND
Trial Attorney