☒ FILED    ☐ LODGED

**Oct 10 2025**

CLERK U.S. DISTRICT COURT
DISTRICT OF ARIZONA

TIMOTHY COURCHAINE
United States Attorney
District of Arizona
Matthew Williams
Assistant U.S. Attorney
Arizona State Bar No. 029059
Two Renaissance Square
40 N. Central Ave., Suite 1800
Phoenix, Arizona 85004
Telephone: 602-514-7500
Email: matthew.williams3@usdoj.gov

LORINDA LARYEA
Acting Chief
Criminal Division, Fraud Section
U.S. Department of Justice
Shane Butland
Trial Attorney
1400 New York Avenue NW
Washington, D.C. 20005
Telephone: 202-286-1177
Email: shane.butland2@usdoj.gov

Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| United States of America, | Case No. CR-24-01040 |
|---|---|
| Plaintiff, | **AMENDED PLEA AGREEMENT** |
| vs. | |
| Jeffrey King, | |
| Defendant. | |

Plaintiff, United States of America, and the defendant, Jeffrey King, hereby agree to resolve this matter on the following terms and conditions:

## 1.   **PLEA**

The defendant will plead guilty to Count 1 of the Indictment, which charges the defendant with a violation of Title 18, United States Code (U.S.C.) § 1349, Conspiracy to Commit Health Care Fraud and Wire Fraud, a Class C felony offense.

2.    **MAXIMUM PENALTIES**

a.    A violation of 18 U.S.C. § 1349 is punishable by a maximum fine of $250,000 or twice the pecuniary gain or loss incurred by another, a maximum term of imprisonment of 20 years, and term of supervised release of 3 years, or all three combined. A maximum term of probation is five years (including a minimum term of one year if probation is imposed).

b.    According to the Sentencing Guidelines issued pursuant to the Sentencing Reform Act of 1984, the Court shall order the defendant to:

(1)    make restitution to any victim of the offense pursuant to 18 U.S.C. § 3663A, unless the Court determines that restitution would not be appropriate;

(2)    pay a fine pursuant to 18 U.S.C. § 3572, unless the Court finds that a fine is not appropriate;

(3)    serve a term of supervised release when a sentence of imprisonment of more than one year is imposed; and

(4)    pay upon conviction a $100 special assessment pursuant to 18 U.S.C. § 3013.

c.    The Court is required to consider the Sentencing Guidelines in determining the defendant's sentence. However, the Sentencing Guidelines are advisory, and the Court is free to exercise its discretion to impose any reasonable sentence up to the maximum set by statute for the crime of conviction, unless there are stipulations to the contrary that the Court accepts.

3.    **EXCLUSION FROM FEDERAL HEALTH CARE PROGRAMS**

a.    The defendant understands and acknowledges that as a result of this plea, the defendant will be excluded as a provider from Medicare, Medicaid, and all federal health care programs. The defendant agrees to complete and execute all necessary documents provided by any department or agency of the federal government, including, but not limited to, the United States Department of Health and Human Services, to effectuate the exclusion within 60 days of receiving the documents. The exclusion will not affect the defendant's

- 2 -

right to apply for and receive benefits as a beneficiary under any federal health care program, including Medicare and Medicaid.

**4.    AGREEMENTS REGARDING SENTENCING**

a.    <u>Recommendations</u>: The United States and the defendant recommend the following as to the sentence to be imposed:

(1)    <u>Base Offense Level</u>.  The defendant's base offense level is 7 pursuant to U.S.S.G. § 2B1.1(a)(1).

(2)    <u>Loss Amount</u>.  A reasonable estimate of the defendant's intended loss exceeds $550,000,000, resulting in an increase of 30 levels pursuant to U.S.S.G. § 2B1.1(b)(1)(P).

(3)    <u>Federal Health Care Offense</u>.  The defendant is pleading guilty to a federal health care offense involving a loss to a government health care program exceeding $20,000,000, resulting in an increase of 4 levels pursuant to U.S.S.G. § 2B1.1(b)(7).

(4)    <u>Sophisticated Means</u>.  The offense involved sophisticated means, and the defendant intentionally engaged in or caused the conduct constituting sophisticated means, resulting in an increase of 2 levels pursuant to U.S.S.G. § 2B1.1(b)(10).

(5)    <u>Aggravating Role</u>.  The defendant was a manager or supervisor (but not an organizer or leader), and the criminal activity involved five or more participants or was otherwise extensive, resulting in an increase of 3 levels pursuant to U.S.S.G. § 3B1.1(a).

(6)    <u>Acceptance of Responsibility</u>.  If the defendant makes full and complete disclosure to the U.S. Probation Office of the circumstances surrounding the defendant's commission of the offense, and if the defendant demonstrates an acceptance of responsibility for this offense up to and including the time of sentencing, the United States will recommend a two-level reduction in the applicable Sentencing Guidelines offense level pursuant to U.S.S.G. § 3E1.1(a).  If the defendant has an offense level of 16 or more, the United States will move the Court for an additional one-level reduction in the applicable Sentencing Guidelines offense level pursuant to U.S.S.G. § 3E1.1(b).

1         (7)    <u>Non-Binding Recommendations.</u> The defendant understands that

2    recommendations are not binding on the Court. The defendant further understands that the

3    defendant will not be permitted to withdraw the guilty plea if the Court does not follow a

4    recommendation.

5         b.    <u>Restitution.</u>    Pursuant to 18 U.S.C. § 3663A, the defendant specifically

6    agrees to pay full restitution, regardless of the resulting loss amount but in no event more

7    than $605,690,110, to all victims directly or proximately harmed by the defendant's

8    "relevant conduct," including conduct pertaining to any dismissed counts or uncharged

9    conduct, as defined by U.S.S.G. § 1B1.3, regardless of whether such conduct constitutes

10   an "offense" under 18 U.S.C. §§ 2259, 3663, or 3663A. The defendant understands that

11   such restitution will be included in the Court's Order of Judgment and that an unanticipated

12   restitution amount will not serve as grounds to withdraw the defendant's guilty plea or to

13   withdraw from this plea agreement. The defendant specifically agrees to restitution to the

14   following health care benefit programs in the amounts identified below:

| | | |
|---|---|---|
| (1) | Medicare: | $586,514,060.92 |
| (2) | TRICARE: | $8,513,163.84 |
| (3) | Anthem Elevance: | $466,982.65 |
| (4) | Bankers Fidelity Life Insurance: | $1,151,085.32 |
| (5) | Blue Cross Blue Shield of Arizona: | $1,811,745.66 |
| (6) | Blue Cross Blue Shield of Minnesota: | $475,889.87 |
| (7) | Blue Cross Blue Shield of Nebraska: | $252,156.71 |
| (8) | Blue Cross Blue Shield of North Dakota: | $230,140.95 |
| (9) | Blue Shield of California: | $177,541.08 |
| (10) | Cigna: | $778,053.72 |
| (11) | Humana: | $1,707,083.54 |
| (12) | Moda Health | $1,599,584.56 |
| (13) | Mutual Omaha Health Insurance: | $205,998.11 |
| (14) | National Association of Letter Carriers: | $627,737.53 |

| | | |
|---|---|---|
| (15) | United Healthcare: | $649,739.52 |
| (16) | Western & Southern Life Insurance: | $529,146.51 |

c. <u>CMS Suspended Payments</u>. The defendant further agrees to waive any ownership interest he may have in the $87,641,543.44 currently suspended by the Centers for Medicare and Medicaid Services ("CMS") ("the Suspended Amount"). The Suspended Amount constitutes payments suspended by CMS based on certain false and fraudulent claims made by APX Mobile Medical LLC to Medicare. The defendant expressly relinquishes any and all rights of any kind that he, or any companies over which he has control, may have with respect to the Suspended Amount, including, but not limited to, any and all claims or rights to have an overpayment determined under 42 C.F.R. § 405.372(c), any and all rights to payment of those funds, and any and all rights to appeal, whether formally or informally and whether administratively or judicially, the right of the United States and/or CMS to retain those funds.

d. <u>Assets and Financial Responsibility</u>. The defendant shall make a full accounting of all assets in which the defendant has any legal or equitable interest. The defendant shall not (and shall not aid or abet any other party to) sell, hide, waste, spend, or transfer any such assets or property before sentencing, without the prior approval of the United States (provided, however, that no prior approval will be required for routine, day-to-day expenditures). The defendant also expressly authorizes the United States Attorney's Office to immediately obtain a credit report as to the defendant in order to evaluate the defendant's ability to satisfy any financial obligation imposed by the Court. The defendant also shall make full disclosure of all current and projected assets to the U.S. Probation Office immediately and prior to the termination of the defendant's supervised release or probation, such disclosures to be shared with the U.S. Attorney's Office, including the Financial Litigation Unit, for any purpose. Finally, the defendant shall participate in the Inmate Financial Responsibility Program to fulfill all financial obligations due and owing under this agreement and the law.

**5.    AGREEMENT TO DISMISS OR NOT TO PROSECUTE**

a.    Pursuant to Fed. R. Crim. P. 11(c)(1)(A), the United States, at the time of sentencing, shall dismiss the following charges as to defendant Jeffrey King: Counts 2–5, 7, and 10 of the Indictment.

b.    This agreement does not, in any manner, restrict the actions of the United States in any other district or bind any other United States Attorney's Office or Division of the U.S. Department of Justice.

**6.    COURT APPROVAL REQUIRED; REINSTITUTION OF PROSECUTION**

a.    If the Court, after reviewing this plea agreement, concludes that any provision contained herein is inappropriate, it may reject the plea agreement and give the defendant the opportunity to withdraw the guilty plea in accordance with Fed. R. Crim. P. 11(c)(5).

b.    If the defendant's guilty plea or plea agreement is rejected, withdrawn, vacated, or reversed at any time, this agreement shall be null and void, the United States shall be free to prosecute the defendant for all crimes of which it then has knowledge and any charges that have been dismissed because of this plea agreement shall automatically be reinstated.  In such event, the defendant waives any and all objections, motions, and defenses based upon the Statute of Limitations, the Speedy Trial Act, or constitutional restrictions in bringing later charges or proceedings.  The defendant understands that any statements made at the time of the defendant's change of plea or sentencing may be used against the defendant in any subsequent hearing, trial, or proceeding subject to the limitations of Fed. R. Evid. 410.

**7.    WAIVER OF DEFENSES AND APPEAL RIGHTS**

The defendant waives (1) any and all motions, defenses, probable cause determinations, and objections that the defendant could assert to the Indictment; and (2) any right to file an appeal, any collateral attack, and any other writ or motion that challenges the conviction, an order of restitution or forfeiture, the entry of judgment against the defendant, or any aspect of the defendant's sentence, including the manner in which the

1   sentence is determined, including but not limited to any appeals under 18 U.S.C. § 3742

2   (sentencing appeals) and motions under 28 U.S.C. §§ 2241 and 2255 (habeas petitions),

3   and any right to file a motion for modification of sentence, including under 18 U.S.C.

4   § 3582(c) (except for the right to file a compassionate release motion under 18 U.S.C.

5   § 3582(c)(1)(A) and to appeal the denial of such a motion).  This waiver shall result in the

6   dismissal of any appeal, collateral attack, or other motion the defendant might file

7   challenging the conviction, order of restitution or forfeiture, or sentence in this case.  This

8   waiver shall not be construed to bar an otherwise-preserved claim of ineffective assistance

9   of counsel or of "prosecutorial misconduct" (as that term is defined by Section II.B of Ariz.

10  Ethics Op. 15-01 (2015)).

11  **8.     DISCLOSURE OF INFORMATION**

12       a.     The United States retains the unrestricted right to provide information and

13  make any and all statements it deems appropriate to the U.S. Probation Office and to the

14  Court in connection with the case.

15       b.     Any information, statements, documents, and evidence that the defendant

16  provides to the United States pursuant to this agreement may be used against the defendant

17  at any time.

18       c.     The defendant shall cooperate fully with the U.S. Probation Office.  Such

19  cooperation shall include providing complete and truthful responses to questions posed by

20  the U.S. Probation Office including, but not limited to, questions relating to:

21            (1)     criminal convictions, history of drug abuse, and mental illness; and

22            (2)     financial information, including present financial assets or liabilities

23  that relate to the ability of the defendant to pay a fine or restitution.

24  **9.     FORFEITURE, CIVIL, AND ADMINISTRATIVE PROCEEDINGS**

25       a.     Nothing in this agreement shall be construed to protect the defendant from

26  administrative or civil forfeiture proceedings or prohibit the United States from proceeding

27  with and/or initiating an action for civil forfeiture.  Pursuant to 18 U.S.C. § 3613, all

28  monetary penalties, including restitution imposed by the Court, shall be due immediately

1    upon judgment, shall be subject to immediate enforcement by the United States, and shall

2    be submitted to the Treasury Offset Program so that any federal payment or transfer of

3    returned property the defendant receives may be offset and applied to federal debts (which

4    offset will not affect the periodic payment schedule).  If the Court imposes a schedule of

5    payments, the schedule of payments shall be merely a schedule of minimum payments and

6    shall not be a limitation on the methods available to the United States to enforce the

7    judgment.

8          b.      The defendant agrees to forfeit, and hereby forfeits, all interest in any asset

9    that the defendant owns or over which the defendant exercises control, directly or

10    indirectly, as well as any property that is traceable to, derived from, fungible with, or a

11    substitute for property that constitutes the proceeds of the offense, or which was used to

12    facilitate the commission of the offense, including but not limited to the following property:

13              • A sum of money equal to approximately $130,813,658, which amount

14                  represents the proceeds that the defendant obtained, directly or indirectly,

15                  possessed, owned, and exercised dominion or control.

16              • The defendant's interests in the assets identified in Exhibit 1.

17          c.      The defendant further agrees to waive all interest in any such asset in any

18    administrative or judicial forfeiture proceeding, whether criminal or civil, state or federal.

19    The defendant agrees to consent to the entry of orders of forfeiture for such property and

20    waives the requirements of Federal Rules of Criminal Procedure 32.2 and 43(a) regarding

21    notice of the forfeiture in the charging instrument, announcement of the forfeiture at

22    sentencing, and incorporation of the forfeiture in the judgment.  The defendant further

23    understands and agrees that forfeiture of the assets is appropriate and in accordance with

24    the applicable forfeiture statutes, which may include Title 8 U.S.C. § 1324(b), Title 18

25    U.S.C. §§ 924(d), 981, 982 and 2253, Title 21 U.S.C. §§ 853 and 881, and Title 28 U.S.C.

26    § 2461(c).

27          d.      Except as provided in subparagraph 9.k below, forfeiture of the defendant's

28    assets shall not be treated as satisfaction of any fine, restitution, cost of imprisonment, or

any other penalty this court may impose upon the defendant in addition to the forfeiture. This agreement does not preclude the United States from instituting any civil or administrative forfeiture proceedings as may be appropriate now or in the future.

e.    The defendant agrees to waive all constitutional and statutory challenges in any manner (including direct appeal, habeas corpus, double jeopardy, or any other means) to any forfeiture imposed as a result of this guilty plea or any pending or completed administrative or civil forfeiture actions, including that the forfeiture constitutes an excessive fine or punishment.  The defendant agrees to take all steps as requested by the United States to pass clear title to forfeitable assets to the United States, and to testify truthfully in any judicial forfeiture proceeding.  The defendant acknowledges that all property covered by this agreement is subject to forfeiture as proceeds of illegal conduct, property facilitating illegal conduct, and substitute assets for property otherwise subject to forfeiture, and that no other person or entity has a legitimate claim to these items listed.

f.    The defendant agrees not to file a claim to any of the property listed in Exhibit 1 in any civil proceeding, administrative or judicial, which may be initiated.  The defendant further agrees that he will not contest civil, administrative, or judicial forfeiture of the property listed in Exhibit 1.  The defendant agrees to waive his right to notice of any forfeiture proceeding involving this property and agrees not to file a claim or assist others in filing a claim in that forfeiture proceeding.

g.    The government reserves its right to proceed against any remaining assets not identified either in this agreement or in any civil actions which are being resolved along with this plea of guilty, including any property in which the defendant has any interest or control, if said assets, real or personal, tangible or intangible, were involved in or proceeds of the offense. The defendant hereby waives and agrees to hold the government and its agents and employees harmless from any and all claims whatsoever in connection with the seizure, forfeiture, and disposal of the property listed above.  Without limitation, the defendant understands and agrees that by virtue of this plea of guilty, the defendant will waive any rights or cause of action that the defendant might otherwise have had to claim

- 9 -

1  that he is a "substantially prevailing party" for the purpose of recovery of attorney fees and

2  other litigation costs in any related civil forfeiture proceeding pursuant to 28 U.S.C.

3  § 2465(b)(1).

4        h.     The defendant has agreed in principle to a settlement with the United States,

5  which remains subject to final approval by the Civil Division of the U.S. Department of

6  Justice, to resolve the defendant's potential liability under the False Claims Act, 31 U.S.C.

7  §§ 3729-3733, and other civil claims and remedies under which he agrees to pay an amount

8  to be determined prior to sentencing ("the Civil Settlement Amount"), for his role in

9  causing the following losses to government health care benefit programs:

10              (1) $586,514,060.92 to Medicare; and

11              (2) $8,513,163.84 to TRICARE.

12        i.     The defendant agrees to enter a settlement agreement with the United States,

13  subject to approval by the Civil Division of the U.S. Department of Justice, memorializing

14  the agreement in principle described in the preceding subparagraph.

15        j.     The defendant agrees that because the False Claims Act provides for treble

16  damages and civil penalties, the Civil Settlement Amount may exceed $592,098,184.76,

17  and that the settlement terms, including monetary terms, remain subject to final approval

18  by the Civil Division of the U.S. Department of Justice.

19        k.     The defendant agrees that any or all of his payments toward restitution under

20  subparagraphs 4.b.1, 4.b.2, and 4.b.3 and the liquidated value, net of any expenses or costs

21  of liquidation, storage, or maintenance, of any or all of his forfeited assets, that is remitted

22  to Medicare and TRICARE may be credited to the Civil Settlement Amount, subject to the

23  approval of the United States.

24        l.     The defendant agrees that no portion of the Suspended Amount will be

25  credited to the Civil Settlement Amount.

26

27

28

10.    **ELEMENTS**

**Conspiracy to Commit Health Care Fraud and Wire Fraud (18 U.S.C. § 1349)**

To prove the crime of Conspiracy to Commit Health Care Fraud and Wire Fraud, in violation of 18 U.S.C. § 1349, the government must prove the following elements beyond a reasonable doubt:

1.    There was an agreement between two or more persons to commit the crimes of health care fraud and wire fraud, in violation of 18 U.S.C. §§ 1343 and 1347; and

2.    The defendant became a member of the conspiracy knowing its object and intending to help accomplish it.

**Health Care Fraud (18 U.S.C. § 1347)**

To prove the crime of Health Care Fraud, in violation of 18 U.S.C. § 1347, the government must prove the following elements beyond a reasonable doubt:

1.    The defendant knowingly and willfully executed or attempted to execute a scheme or plan to defraud a health care benefit program, or a scheme or plan to obtain money or property owned by or under the custody or control of a health care benefit program, by means of materially false or fraudulent pretenses, representations, or promises;

2.    The defendant acted with the intent to defraud; that is, the intent to deceive and cheat;

3.    Medicare, TRICARE, and the Commercial Insurers were health care benefit programs; and

4.    The scheme or plan was executed in connection with the delivery of or payment for health care benefits, items, or services.

**Wire Fraud (18 U.S.C. § 1343)**

To prove the crime of Wire Fraud, in violation of 18 U.S.C. § 1343, the government must prove the following elements beyond a reasonable doubt:

1.  The defendant knowingly participated in a scheme or plan to defraud for the purpose of obtaining money or property by means of false or fraudulent pretenses, representations, promises, or omitted facts;

2.  The statements made or facts omitted as part of the scheme were material; that is, they had a natural tendency to influence, or were capable of influencing, a person to part with money or property;

3.  The defendant acted with the intent to defraud, that is, the intent to deceive and cheat; and

4.  The defendant used, or caused to be used, an interstate wire communication to carry out or attempt to carry out an essential part of the scheme.

**11.  FACTUAL BASIS**

a.  The defendant admits that the following facts are true and that if this matter were to proceed to trial the United States could prove the following facts beyond a reasonable doubt:

b.  Beginning in or around November 2022, and continuing through in or around May 2024, within the District of Arizona and elsewhere, the defendant knowingly and willfully agreed and conspired with Alexandra Gehrke, a/k/a "Lexie" Gehrke ("Gehrke"), Company 1, and others, in violation of 18 U.S.C. § 1349, to commit wire fraud, in violation of 18 U.S.C. § 1343, and health care fraud, in violation of 18 U.S.C. § 1347. Specifically, the defendant, individually and through an entity he owned, operated, and controlled, conspired with Gehrke and others to unlawfully enrich himself and others by submitting and causing the submission of false and fraudulent claims to Medicare, TRICARE, and Commercial Insurers[1] for amniotic wound allografts ("allografts") ordered and purchased

---

[1] The Commercial Insurers include, but are not limited to, Anthem Elevance Health, Bankers Fidelity Life Insurance, Blue Cross Blue Shield of Arizona, Blue Cross Blue Shield of Minnesota, Blue Bross Blue Shield of Nebraska, Blue Cross Blue Shield of North Dakota, Blue Shield of California, Cigna, Humana, Moda Health, Mutual Omaha Health, National Association of Letter Carriers, United Healthcare, and Western & Southern Life Insurance Company.

1   from Company 1 that were medically unreasonable and unnecessary, ineligible for
2   reimbursement, and procured through illegal kickbacks. The defendant, Gehrke, and their
3   co-conspirators diverted proceeds of the fraud for their own personal use and benefit, and
4   to further the fraud.

5   Medicare and TRICARE are "health care benefit programs," as defined in 18 U.S.C.
6   § 24(b), and "federal health care programs," as defined in 42 U.S.C. § 1320a-7b(f). The
7   Commercial Insurers are "health care benefit programs," as defined in 18 U.S.C. § 24(b).

8   The defendant co-owned, controlled, and operated APX Mobile Medical LLC
9   ("APX") and was also a sales representative for Apex Mobile Medical LLC ("Apex Mobile
10  Medical"). Gehrke co-owned, controlled, and operated Apex Mobile Medical and Apex
11  Medical LLC ("Apex"), and served as Apex's Chief Executive Officer. Gehrke also solely
12  owned, controlled, and operated Viking Medical Consultants LLC (d/b/a Viking Medical
13  Marketing LLC) ("Viking").

14  Company 1, a limited liability company formed in Texas, was a wholesale
15  distributor of allografts. Medicare reimbursed claims for the allografts distributed by
16  Company 1 at an extremely high rate, exceeding $1,000 per square centimeter for certain
17  allografts.

18  Apex Mobile Medical and APX were enrolled Medicare providers and submitted
19  claims to Medicare for payment, including claims for the furnishing of allografts purchased
20  from Company 1.

21  Apex and Viking arranged for and recommended the ordering and purchasing of
22  allografts sold by Company 1. Apex and Viking also referred patients to Apex Mobile
23  Medical and APX, among other Medicare enrolled providers, for the furnishing of
24  allografts purchased from Company 1.

25  The defendant and Gehrke, through Apex and Viking, arranged for and
26  recommended the ordering and purchasing of allografts sold by Company 1, and referred
27  patients to Apex Mobile Medical and APX, for the furnishing of allografts purchased from
28  Company 1.

Gehrke, through Apex and Viking, contracted with medically untrained sales representatives, including the defendant, to arrange for and recommend the ordering and purchasing of allografts sold by Company 1, and to refer patients to enrolled Medicare providers, including Apex Mobile Medical and APX, for the furnishing of allografts purchased from Company 1.

Gehrke paid the sales representatives illegal kickbacks based on the size and quantity of Company 1's allografts that were applied to patients and billed to Medicare. From approximately December 2022 through approximately May 2023, Gehrke paid the defendant illegal kickbacks totaling approximately $471,993.

The defendant and Gehrke instructed sales representatives to locate facilities with elderly populations, such as nursing homes, assisted living facilities, and hospice facilities, and identify patients with any wound at any stage to which Company 1's allografts could be applied.  In a meeting led by the defendant and Gehrke, Gehrke told the sales representatives to specifically target hospice facilities because those facilities were "where the most money [was] at with [her] company," and directed the sales representatives to order Company 1's allografts only in sizes 4x6 centimeters or larger—despite the availability of smaller sizes of allografts—even if the patient's wound was "the size of [her] little fingernail."  Gehrke further stated that if any of APX's medical providers had an issue with the size of the grafts, the sales representatives should direct them to call the defendant or APX's Director of Operations, who would reiterate the "policy" that only grafts sized 4x6 centimeters or larger could be ordered.

The defendant, through APX, and Gehrke, through Apex Mobile Medical, purchased allografts from Company 1 that were ordered and recommended to be ordered by Apex and Viking's medically untrained sales representatives.  The defendant, through APX, and Gehrke, through Apex Mobile Medical, solicited and received illegal kickbacks and rebates from Company 1 in violation of 42 U.S.C. § 1320a-7b(b)(1).  Gehrke, Company 1, and others concealed and disguised these illegal kickbacks and rebates by, among other ways, causing sham invoices to be issued by Company 1 that reflected the

full, non-rebated price of the allografts and opening a so-called "joint venture" bank account to conceal the transfer of the illegal kickbacks from Company 1 to APX.

Neither the defendant nor Gehrke reported or remitted Company 1's rebates to Medicare as required by federal law and Medicare's rules and regulations. Instead, the defendant and Gehrke unlawfully retained the rebated amounts for their own use and benefit, and to further the fraud. From in and around April 2023, through in and around May 2024, the defendant received, through APX, approximately $130,341,665 in illegal kickbacks in the form of rebates from Company 1 in exchange for the purchasing and ordering of Company 1's allografts that were billed to Medicare.

The defendant and Gehrke, through Apex Mobile Medical and APX, contracted with nurse practitioners to apply the allografts ordered and purchased from Company 1 to patients identified and referred by the defendant, Gehrke, and Apex and Viking's sales representatives. The defendant and Gehrke directed the nurse practitioners to apply all allografts that the sales representatives ordered even if the quantity and sizes were medically unreasonable and unnecessary. This resulted in the application of allografts to infected wounds, wounds that had already healed, wounds that were not responding to the allografts, and wounds that would not heal because of the terminally ill patients' comorbidities. It also resulted in the application of allografts that grossly exceeded the size of the wound. Some patients died within days or the same day of the allograft application.

From in and around June 2022, through in and around May 2024, Gehrke received, individually and through Apex Mobile Medical, Apex, and Viking, approximately $279,912,916 in illegal kickbacks from Company 1 in exchange for the purchasing, ordering, and arranging for and recommending the purchasing and ordering of its allografts that were billed to Medicare.

From in and around November 2022, through in and around May 2024, the defendant, Gehrke, and others, through Apex Mobile Medical and APX, submitted approximately $1,178,196,099 in false and fraudulent claims to Medicare, TRICARE, and Commercial Insurers for furnishing and applying Company 1's allografts. Medicare,

TRICARE, and Commercial Insurers paid approximately $605,690,110 based on those claims. These payments constitute proceeds of the conspiracy to commit health care fraud and wire fraud and were deposited into the accounts and used to purchase the assets identified in Exhibit 1.

The defendant shall swear under oath to the accuracy of this statement and, if the defendant should be called upon to testify about this matter in the future, any intentional material inconsistencies in the defendant's testimony may subject the defendant to additional penalties for perjury or false swearing, which may be enforced by the United States under this agreement.

## APPROVAL AND ACCEPTANCE OF THE DEFENDANT

I have read the entire plea agreement with the assistance of my attorney. I understand each of its provisions and I voluntarily agree to it.

I have discussed the case and my constitutional and other rights with my attorney. I understand that by entering my plea of guilty I shall waive my rights to plead not guilty, to trial by jury, to confront, cross-examine, and compel the attendance of witnesses, to present evidence in my defense, to remain silent and refuse to be a witness against myself by asserting my privilege against self-incrimination, all with the assistance of counsel, and to be presumed innocent until proven guilty beyond a reasonable doubt.

I agree to enter my guilty plea as indicated above on the terms and conditions set forth in this agreement.

I have been advised by my attorney of the nature of the charges to which I am entering my guilty plea. I have further been advised by my attorney of the nature and range of the possible sentence and that my ultimate sentence shall be determined by the Court after consideration of the advisory Sentencing Guidelines.

My guilty plea is not the result of force, threats, assurances, or promises, other than the promises contained in this agreement. I voluntarily agree to the provisions of this agreement, and I agree to be bound according to its provisions.

1    I understand that if I am granted probation or placed on supervised release by the

2    Court, the terms and conditions of such probation/supervised release are subject to

3    modification at any time.  I further understand that if I violate any of the conditions of my

4    probation/supervised release, my probation/supervised release may be revoked and upon

5    such revocation, notwithstanding any other provision of this agreement, I may be required

6    to serve a term of imprisonment or my sentence otherwise may be altered.

7    This written plea agreement, and any written addenda filed as attachments to this

8    plea agreement, contain all the terms and conditions of the plea.  Any additional

9    agreements, if any such agreements exist, shall be recorded in a separate document and

10    may be filed with the Court under seal; accordingly, additional agreements, if any, may not

11    be in the public record.

12    I further agree that promises, including any predictions as to the Sentencing

13    Guideline range or to any Sentencing Guideline factors that will apply, made by anyone

14    (including my attorney) that are not contained within this written plea agreement, are null

15    and void and have no force and effect.

16    I am satisfied that my defense attorney has represented me in a competent manner.

17    I fully understand the terms and conditions of this plea agreement.  I am not now

18    using or under the influence of any drug, medication, liquor, or other intoxicant or

19    depressant that would impair my ability to fully understand the terms and conditions of this

20    plea agreement.

21

22    10-10-25
      _____                    _____
      Date                                           JEFFREY KING
23                                                   Defendant

24

25                          **APPROVAL OF DEFENSE COUNSEL**

26    I have discussed this case and the plea agreement with my client in detail and have

27    advised the defendant of all matters within the scope of Fed. R. Crim. P. 11, the

28    constitutional and other rights of an accused, the factual basis for and the nature of the

- 17 -

offense to which the guilty plea will be entered, possible defenses, and the consequences of the guilty plea including the maximum statutory sentence possible.  I have further discussed the concept of the advisory Sentencing Guidelines with the defendant.  No assurances, promises, or representations have been given to me or to the defendant by the United States or any of its representatives that are not contained in this written agreement. I concur in the entry of the plea as indicated above and that the terms and conditions set forth in this agreement are in the best interests of my client.  I agree to make a bona fide effort to ensure that the guilty plea is entered in accordance with all the requirements of Fed. R. Crim. P. 11.

Date 10/10/2025

BRIAN RAFFERTY
Attorney for Defendant

- 18 -

1  **APPROVAL OF THE UNITED STATES**

2      I have reviewed this matter and the plea agreement.  I agree on behalf of the United

3  States that the terms and conditions set forth herein are appropriate and are in the best

4  interests of justice.

5

6                                     TIMOTHY COURCHAINE
                                   United States Attorney
                                   District of Arizona

7

8    October 2, 2025                 */s/ Matthew Williams*
  Date

9                                     MATTHEW WILLIAMS
                                   Assistant U.S. Attorney

10

11

12                                     LORINDA LARYEA

13                                     Acting Chief
                                   Criminal Division, Fraud Section

14                                     U.S. Department of Justice

15    October 2, 2025

16    Date                               SHANE BUTLAND
                                   Trial Attorney

17                                     Criminal Division, Fraud Section
                                   U.S. Department of Justice

18

19

20

21  **ACCEPTANCE BY THE COURT**

22

23    October 10, 2025

24    Date                                 Hon. Roslyn O. Silver
                                   United States Senior District Judge

25

26

27

28

## AMENDED EXHIBIT 1

(1)    The property at 1637 North Sunset Drive, Tempe, Arizona 85251, titled to J King Holdings, LLC.

(2)    The property at 6246 East Hillcrest Blvd., Scottsdale, Arizona 85251, titled to AEAGJK IRREVOCABLE TRUST.

(3)    The 2016 Ferrari 488 Spider bearing Vehicle Identification Number ZFF80AMA6G0219407, titled to JEXIE ENTERPRISES INC.

(4)    The 2023 Mercedez-Benz SL63 AMG bearing Vehicle Identification Number W1KVK8BB6PF015497, titled to JEXIE ENTERPRISES INC.

(5)    2023 Mercedez-Benz GLE bearing Vehicle Identification Number 4JGFB6BB7PA858815, titled to KING MEDICAL CONSULTANT LLC.

(6)    The 2022 Mercedes-Benz G63 bearing Vehicle Identification Number W1NYC8AJ6NX455281, titled to AMTG Medical Consultant, LLC.

(7)    $19,591,940 seized from the U.S. Bank checking account ending in 5798 in the name of ALEXANDRA GEHRKE.

(8)    $13,576,549.93 seized from the U.S. Bank checking account 7681 in the name of AMTG MEDICAL CONSULTANT LLC.

(9)    $10,793,620 seized from the U.S. Bank checking account ending in 7699 in the name of JEXIE ENTERPRISES INC.

(10)    $8,000,000 Sentinel Security Life Insurance policy number ending in 5602 in the name of ALEXANDRA GEHRKE.

(11)    $8,000,000 Sentinel Security Life Insurance policy number ending in 8279 in the name of JEFFREY KING.

(12)    $8,000,000 North American Company for Life and Health Insurance policy number ending in 0314 in the name of ALEXANDRA GEHRKE.

(13)    $3,320,969.25 seized from the Charles Schwab account ending in 3965 in the name of JKING VENTURES INC.

(14)    $1,265,539.26 seized from the Charles Schwab account ending in 9244 in

the name of KING MEDICAL CONSULTANT LLC.

(15)    $1,000,025.19 seized from the Wells Fargo Bank checking account ending in 1101 in the name of JEXIE ENTERPRISES INC.

(16)    $2,800,000 from the Alerus Bank checking account ending in 8329 in the name of JEXIE ENTERPRISES INC.

(17)    $1,999,978 seized from the Alerus Bank checking account ending in 7834 in the name of ALEXANDRA GEHRKE.

(18)    $1,390,922.91 seized from the Alerus Bank checking account ending in 8220 in the name of AMTG MEDICAL CONSULTANT LLC.

(19)    $940,373 seized from the U.S. Bank checking account ending in 7665 in the name of THE FITZGERALD IRREVOCABLE TRUST.

(20)    $512,857.28 seized from the Alerus Bank checking account ending in 2750 in the name of CAPITAL IS KING LLC.

(21)    $3,356,635.97 seized from the U.S. Bank checking account ending in 5772 in the name of THE CONSULTING FIRM LLC.

(22)    $788,645.14 seized from U.S. Bank checking account ending in 5202 in the name of KING MEDICAL CONSULTANT LLC.

(23)    $528,387.94 seized from Wells Fargo checking account ending in 1495 in the name of ALEXANDRA M. GEHRKE.

(24)    $569,195.65 seized from Wells Fargo savings account ending in 8608 in the name of ALEXANDRA M. GEHRKE.

(25)    $555,900 seized from Wells Fargo checking account ending in 1487 in the name of ALEXANDRA M. GEHRKE.

(26)    $247,073.89 seized from Wells Fargo savings account ending in 3965 in the names of ALEXANDRA M. GEHRKE and JOAN MARIE GEHRKE.

(27)    $777,277.80 seized from Wells Fargo checking account ending in 0871 in the name of AMTG MEDICAL CONSULTANT LLC.

(28)    $356,898.00 seized from Charles Schwab brokerage account ending in 2902

2

in the name of J KING HOLDINGS INC.

(29)  $100,771.93 seized from Charles Schwab brokerage account ending in 8345 in the name of THE OTHER CONSULTING FIRM LLC.

(30)  $1,260,215.38 seized from Flagstar Bank trust account ending in 2863 in the name of KENNETH MURRAY.

(31)  $375,900.04 seized from New York Community Bank checking account ending in 9452 in the name of ALEXANDRA MARIE TAUKEN GEHRKE.

(32)  $228,026.67 seized from New York Community Bank savings account ending in 3754 in the name of ALEXANDRA MARIE TAUKEN GEHRKE.

(33)  $2,593,130.55 seized from Royal Bank of Canada cash account ending in 5128 in the name of SCOTTSDALE ASSURANCE GROUP INC.

(34)  Three 1-ounce PAMP Suisse 999.9 Fine Gold Bullion - N493741, N493740 and N493742.

(35)  Twenty 2024 1-ounce .999 Pure Silver American Eagles in holder.

(36)  Two PAMP Suisse 1-ounce Fine Gold Bullion - N93739 and N93738.

(37)  Twenty-three Counterfeit Louis Vuitton Bags.

(38)  Counterfeit Audemars Piguet Men's watch 181247 No4005 Royal Oak Le Brassus.

(39)  Lot of costume jewelry containing 1 pair of earrings, 2 bracelets, and 1 ring.

(40)  18k gold yellow Gold-Plated Double C Cartier 468122 Lighter.

(41)  Four "Herkimer diamond" quartz crystals.

(42)  14k yellow gold Tanzanite and diamond ring set.

(43)  15k white gold diamond ring set with 16 straight baguette cut diamonds.

(44)  Platinum diamond ring set with six 1.7mm round brilliant cut diamonds.

(45)  14k yellow gold diamond ring set with center oval cut diamond.

(46)  Costume jewelry necklace set with an oval cut Citrine.

(47)  14k yellow gold amethyst necklace set with center oval cut amethyst.

(48)  14k Garnet pendant hung on a 16-inch amethyst bead necklace.

3

(49)   18k yellow gold Tiffany and Co. Elsa Peretti Starfish necklace.

(50)   18k yellow gold Paloma Picasso scribble style pendant on a 16-inch chain.

(51)   18k yellow gold Elsa Peretti Tiffany & Co. Seahorse necklace.

(52)   14k two tone diamond necklace set with 72 round brilliant cut diamonds.

(53)   Royal Canadian Mint Monnaie 10 oz .9999 Fine Silver Argent Pur Bullion #991425906.

(54)   Royal Canadian Mint Monnaie 10 oz .9999 Fine Silver Ardent Pur Bullion #991425907.

(55)   Royal Canadian Mint Monnaie 10 oz .9999 Fine Silver Argent Pur Bullion #991425908.

(56)   Royal Canadian Mint Monnaie 10 oz .9999 Fine Silver Argent Pur Bullion #991425909.

(57)   Royal Canadian Mint Monnaie 10 oz .9999 Fine Silver Argent Pur Bullion #991422484.

(58)   Royal Canadian Mint Monnaie 10 oz 9999 Fine Silver Argent Pur Bullion #991422487.

(59)   Royal Canadian Mint Monnaie 10 oz .9999 Fine Silver Argent Pur Bullion #991422488.

(60)   Stainless Steel Gent's Cartier Santos 40mm Date Watch Serial Number 905815CX.

(61)   Stainless Steel Gent's Rolex Datejust Watch with Black Dial Serial Number Z18001.

(62)   Stainless Steel Rolex Daytona Cosmograph Watch Serial Number CZ771495.

(63)   Rolex Sea-Dweller Oyster Stainless Steel Watch Serial Number 9H5802X5.

(64)   Twenty-five Canadian Maple Leaf 1-ounce .9999 pure gold coins.

(65)   Eight Australia $100 Dollars 1-ounce gold coins.

(66)   Five United Kingdom 1-ounce 100-pound gold coins.

(67)   Three Elizabeth II gold coins.

(68)   Three Grant Wood American Commemorative Series Coins with American Gothic.

(69)   Six United States $50 Eagle gold coins.

(70)   Nine 1915 Austrian 100 Corona gold coins.

(71)   Two 1908 Hungary 100 Korona gold coins.

(72)   Four Mexico 50 pesos gold coins.

(73)   Twenty Metalor 1-ounce 999.9 fine gold bullion.

(74)   Twelve Valcambi Suisse 1-ounce gold bullion.

(75)   Four PAMP Suisse 1-ounce gold bullion.

(76)   Four IGR one 1 ounce 999.9 fine gold bullion.

(77)   Three Credit Suisse 1 ounce 999.9 fine gold bullion.

(78)   2018 Australia Elizabeth II 999.9 1-ounce gold bullion.

(79)   Ten South African Krugerrand 1-ounce gold coins.

(80)   Eighty-eight Britannia 1/4-ounce 25-pound gold coins.

(81)   Two Canada 1 1/2-ounce $150 gold bullion coins.

(82)   Three Werner Philharmoniker 2000 Schilling 999.9 pure 1-ounce coins.

(83)   Two Buffalo 1-ounce gold coins.

(84)   Two Royal Canadian Mint 10-ounce Fine Silver Argent Pur Bullion.

(85)   Ten 1-gram silver bullion assorted style bars.

(86)   Three-hundred and eighty U.S. American Eagle 1 ounce silver coins.

(87)   Stainless Steel Ladies Rolex Datejust Watch Serial Number 968E58Z5.

(88)   Fifteen Liberty Head $20 gold coins

(89)   2009 American Eagle $50 gold coin.

(90)   Forty-five Krugerrand gold coins.

(91)   Six Canadian Maple Leaf $50 gold coins.

(92)   Six Canada 1/20th ounce Maple Leaf $1 gold coins.

(93)   Canada 1/10th ounce Maple Leaf $5 gold coin.

(94)    Two Canadian 1/4-ounce Maple Leaf $10 gold coins.

(95)    Cartier 18k white Panthere style necklace.

(96)    14k white gold diamond bracelet set with 68 round brilliant cut diamonds weighs 6.3 grams.

(97)    14k white gold diamond bracelet set with 68 round brilliant cut diamonds weighs 6.7 grams.

(98)    14k white gold diamond bracelet set with 15 round brilliant cut diamonds.

(99)    Gucci heart bracelet.

(100)   Sterling silver with Cubic Zirconia earrings.

(101)   Cartier 18k white gold Love ring XQS521 50.

(102)   14k white gold diamond ring set with 7 round brilliant cut diamonds.

(103)   14k white gold Tiffany style 6 prong Lab Grown diamond ring set.

(104)   Audemars Piguet Men's chronograph watch 26240ST Royal Oak Serial Number GM3804N.

(105)   Audemars Piguet Men's chronograph watch 26120ST dual time Royal Oak Serial Number H41161 No 3890.

(106)   Costume jewelry in a black jewelry box.

(107)   Three sterling silver earring pairs.

(108)   18k yellow gold necklace.

(109)   Three Louis Vuitton Marc Newson Limited Edition Horizon Rolling Suitcases, Model Horizon.

(110)   Three Louis Vuitton Marc Newson Rolling Trunk, Model M10117.

(111)   Louis Vuitton Taiga District PM Shoulder Bag.

(112)   Louis Vuitton Eclipse Sac Plat 24 Shoulder Bag.

(113)   Three Louis Vuitton Monogram Eclipse Dopp Kit Toiletry Pouch Bags.

(114)   Louis Vuitton Monogram Eclipse District PM Messenger Set Bag.

(115)   Louis Vuitton Monogram Eclipse Discovery Backpack PM.

(116)   Louis Vuitton Monogram Eclipse Trio Messenger Shoulder Bag.

(117)  Louis Vuitton Black Taiga Leather Avenue Sling Bag NM.

(118)  Louis Vuitton Monogram Week-End Tote GM.

(119)  Two Louis Vuitton Monogram Eclipse Passport Covers.

(120)  Louis Vuitton Empriente Zoe Wallet.

(121)  Louis Vuitton Multiple Wallet.

(122)  Louis Vuitton Pocket Organizer Black/Noir.

(123)  Louis Vuitton Felicie Black Credit Card Insert.

(124)  Louis Vuitton The Neverfull GM Tote Removable Pouch.

(125)  Louis Vuitton Black Monogram Empriente Leather Felicie Pochette.

(126)  Louis Vuitton Reverse Monogram Eclipse Pouch.

(127)  $367,150 cash.

(128)  Linea Research ASC 48 Loudspeaker Processor (serial no. 10324076).

(129)  Linea Research ASC 48 Loudspeaker Processor (serial no. 10324063)

(130)  Triad Orbit T2 Microphone Stands (4).

(131)  AVID MTRX 8CH AD Card (7) (serial nos. 7201302331240, 7201302331119, 7201302328251, 7202302336101, 7202302336154, 7201302331116, 7201302331115).

(132)  AVID Pro Tools HDX Card Software (2) (serial nos. ENEOF32200043B, ENEOF24800029A).

(133)  AVID MTRX 8CH DA Card (6) (serial nos. 7202302336155, 7202302336160, 7202302336136, 7202302336156, 7202302336153, 7202302336152).

(134)  RND Master Buss Processor (serial no. P2MB4678).

(135)  RND Master Buss Transformer (serial no. MBT00787).

(136)  RND 5035 Shelford Channel Microphone Amp (serial No. 5035-06266).

(137)  Tube Tech PE 1C (2) (serial nos. 19186, 19187).

(138)  Tube Tech SMC 2BM Processor (serial no. 16587).

(139)  AVID MTRX-II Audio Interface (2) (serial nos. MTRXII-100691, MTRXII-

100673).

(140) Live Mix AD24 Headphone System (serial no. 12-04-02068).

(141) Live Mix Mix-16 Headphone System (serial no. 12-02-07164).

(142) Live Mix MT-1 Stand Adapter Headphone System (8).

(143) Live Mix 25' Cat 6 Cables Headphone System (8).

(144) Live Mix CS Solo Headphone Mixer (8) (serial nos. 12-11-05001, 12-11-05002, 12-11-04999, 12-11-05004, 12-11-05003, 12-11-05012, 12-11-05000, 12-11-04998).

(145) Rupert Neve Designs 5088 32Ch Recording Console (serial no. 345).

(146) Neumann U67 Microphones (2).

(147) Neumann KM 184 Stereo Pair Black Microphones (2).

(148) Neumann U4 Fet Collector's Edition Microphones (2).

(149) Neumann M49V Microphones (2).

(150) Sennheiser MD 441-U Microphone.

(151) Sennheiser MD 421 Microphones (4).

(152) Triad Orbit Mini/TM Microphone Tripods (5).

(153) Triad Orbit Grab Bags Ballast (5).

(154) Triad Orbit O2X Dual Bloom Stands (3).

(155) Triad Orbit T1-OM-M2 Tripod Stand System (3).

(156) Triad Orbit O1L Orbital Bloom.

(157) Triad Orbit Mini Single Arm Orbital Bloom Microphone Stand.

(158) Triad Orbit Universal Smart Phone/Tablet Holders (3).

(159) Triad Orbit IO-H2/12 5/8" Mount Heads (3).

(160) Triad Orbit IO Desk Laptop Stands (2).

(161) Grace SB-66 Space Bar Kit, Microphone Placement Bar.